Raul **CONTRERAS**, Antonio Contreras, Amalia J. Gloria, Arlene Martinez, Helen's Pizza, d/b/a Como's Pizza, and Dave Clark, Plaintiffs,

v.

**CITY OF CHICAGO**, a municipal corporation, Carolyn Shoenberger, both individually and as Commissioner of the City of Chicago's Department of Consumer Services, Eugene Schulter, both individually and as Alderman of the 47th Ward, Defendants.

No. 94 C 4201.

United States District Court,
N.D. Illinois,
Eastern Division.

March 29, 1996.

Michael Edward Lavelle, Lavelle, Juneau & McCollom, Ltd., Oak Park, IL and Kevin E. Bry, Oak Park, IL, for plaintiffs.

Diane M. Pezanoski, Mary Beth Snyder, City of Chicago, Law Department Corporation Counsel, Michael A. Forti, City of Chicago Law Department, Susan S. Sher, Corporation Counsel, City of Chicago, and Kenneth L. Schmetterer, Assistant Corporation Counsel, Litigation Division, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

■ On May 23, 1994, Como's Pizza, a restaurant located at 1742 W. Wilson Avenue in the City of Chicago, was temporarily shut down for approximately three days after sanitarians from the City of Chicago's Department of Consumer Services issued citations to Como's for (1) unsanitary equipment, (2) improper pest control, (3) unsanitary interiors, (4) inadequate temperature of raw meat, and (5) having no food sanitarian certificate on the premises. The inspection by the city sanitarians followed a meeting called by defendant Alderman Eugene Schulter and attended by, among others, defendant Carolyn Shoenberger, the City's Commissioner of the Department of Consumer Services, after Schulter's office had received numerous complaints about Como's by area residents. Plaintiff Helen's Pizza Inc. d/b/a Como's Pizza, joined by Como's principal owner and manager Dave Clark and several of Como's employees, now bring this federal civil rights lawsuit against the City of Chicago, Alderman Schulter, and Commissioner Shoenberger, alleging that the inspection and shutdown of Como's was racially motivated and that the defendants violated the City's Municipal Code when sanitarians from the Department of Consumer Services rather than the Department of Health inspected and shut down the restaurant. The plaintiffs allege that defendants have infringed their rights under the First, Fourth, and Fourteenth Amendments and they seek money damages as well as injunctive and declaratory relief. Defendants Schulter and Shoenberger are sued in both their official and individual capacities.[1] Defendants' motion for summary

---

1. In a Minute Order dated September 18, 1995, upon the motion of defendant Schulter, this Court dismissed the official capacity claims against Schulter, finding those claims to be redundant in light of the fact that the plaintiffs have also named the City itself as a defendant.

*See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) ("Official capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' ... [A]n official capacity suit is, in all respects other than

judgment on all counts is presently before the Court, as is plaintiffs' motion for partial summary judgment as to (1) whether defendant Schulter may invoke the affirmative defense of absolute legislative immunity, and (2) whether the City violated the Municipal Code by using sanitarians from the Department of Consumer Services rather than the Department of Health to inspect and shut down Como's.

## RELEVANT FACTS

Como's is a carry-out restaurant that has been operating since 1988 in Chicago's Ravenswood neighborhood, which, in relevant part, is within defendant Schulter's aldermanic ward. Plaintiff Dave Clark is the sole owner of Como's, which has employed numerous people over the years including plaintiffs Amalia Gloria, Antonio and Raul Contreras, and Arlene Martinez. (Defs.' Facts ¶ 9; Pls.' Add'l Facts ¶ 1). Como's business included a combination of walk-in customers, phone-order deliveries, and sales to mobile food trucks (such as the "Thunderbird" trucks). (Pls.' Add'l Facts ¶ 4). Como's has sought to involve itself in the community over the years by sponsoring a Little League baseball team, and donating food to a school's spaghetti dinner. (*Id.* ¶ 45).

Across the street from Como's Pizza live Suzanne and Victoria Khamis, who have resided in their present home for at least 8 to 10 years and who have lived in the immediate neighborhood for approximately 20 years.

(Pls.' Add'l Facts ¶ 11; V. Khamis Dep. at 2–3; S. Khamis Dep. at 19–20). For about the last 9 or 10 years, Victoria Khamis has been the president of a community organization called UPRAVE which was founded 18 to 20 years ago by members of the Khamis family. Victoria Khamis testified that at any given time, UPRAVE has about 50 to 100 active members. It calls a general meeting every year and also holds numerous special meetings (sometimes more than once per week) to discuss discrete issues. (Pls.' Add'l Facts ¶ 14). According to Victoria Khamis UPRAVE's motto is "a good neighbor is a nosy neighbor," and the organization performs a variety of activities, including going to housing and juvenile court, supervising juveniles who are performing court-ordered community service, being concerned with police matters and other neighborhood problems, neutering and placing animals, taking people to medical appointments, or "whatever a good neighbor does." (V. Khamis Dep. at 29–32; Pls.' Add'l Facts ¶ 15).

■ Fueling plaintiffs' complaint are charges that the Khamis sisters harbored discriminatory animus against Mexicans. Plaintiff Amalia Gloria testified that she once had a conversation with Suzanne Khamis in which Khamis stated that there was "so much garbage outside all the time because these Mexican people over here are so dirty, they keep everything dirty, because they're so dirty."[2] (Gloria 5/17 Dep. at 40). When

---

name, to be treated as a suit against the entity.") (internal citation omitted). Although defendant Shoenberger has not moved for dismissal of the official capacity claims against her, the Court dismisses those claims *sua sponte* for the same reason.

2. Defendants have objected to plaintiffs' reliance on Gloria's testimony, contending that it is hearsay. *See* Defs.' Resp.Add'l Facts ¶¶ 25, 26. Indeed, virtually every time plaintiffs have attempted to rely on witnesses' statements as to alleged comments by the Khamis sisters, the defendants have objected on hearsay grounds. *See* Defs.' Resp.Add'l Facts ¶¶ 27–29; *see also* Defs.' Mem. Supp.Mot. Strike at 3, 4 (characterizing affidavit testimony by Paul Flynn and Benny Garza as "replete with hearsay"). Defendants' hearsay objections are without merit and are therefore overruled. By definition, " 'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in*

evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c) (emphasis added). "If the significance of an offered statement lies only in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *Id.* Advisory Comm. Note (citing *Emich Motors Corp. v. General Motors Corp.*, 181 F.2d 70 (7th Cir.1950), *rev'd on other grounds*, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951)); *see also Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1090 (5th Cir.1988); *Henein v. Saudi Arabian Parsons Ltd.*, 818 F.2d 1508, 1512 (9th Cir.1987). Here, the only significance of the statements allegedly made by the Khamises lies in the fact that they were made, thereby serving as evidence of their discriminatory animus. Accordingly, the proffered testimony is not hearsay. Moreover, even if the proffered testimony were regarded as hearsay it would nevertheless be admissible under Rule 803(3), which provides for the admission of an hearsay statement if it is "[a] state-

Gloria informed Suzanne Khamis that she was Mexican, Khamis stated that Gloria was different because she was born in this country. (*Id.*) On another occasion, Suzanne Khamis complained to Gloria about Como's failure to leave a night light on and in the context of that conversation Khamis stated that "some Mexican guy" had defecated in the alley. (*Id.* at 44). With respect to Suzanne Khamis' reference to the individual as a "Mexican guy," Gloria noted "[s]he was always referring like that when we spoke." (*Id.; see also* Gloria 6/2 Dep. at 5, commenting "She had a mouth for that."). Plaintiff Arlene Martinez testified that a woman who lived in the corner house at Wilson and Hermitage (presumably the Khamis residence) used to complain—with reference to the Como's employees standing outside the store—about the "Latinos out there, that we were gangbangers." (Martinez Dep. at 47). As further evidence of the Khamises' discriminatory animus, plaintiffs offer the deposition testimony of Maria Tranculov, who worked at the apartment complex directly next door to Como's at 4606 N. Hermitage. Tranculov testified that a few years ago she attended a meeting at a church on the next block during which the 4606 N. Hermitage building was discussed as was Como's. Tranculov testified that Victoria Khamis spoke at the meeting. She then testified as follows:

Q. [By plaintiffs' counsel] And do you recall her making some derogatory comments . . .?

A. Yes.

Q. You recall her at that meeting complaining about the tenants of your building and that they were affiliated with gangs, right?

A. Yes.

Q. And you recall her saying that she, Victoria Khamis, was sick of sitting on the porch or watching from her house the tenants of your house come out of the building, right?

A. Yes.

Q. And she said, didn't she, that she was sick of seeing them with their funny hats and boots, right?

A. Yes.

Q. And she was sick of watching them eat their tamales or tortillas, right?

A. Yes.

. . .

Q. You understood, didn't you, by the words she used about the funny hats and boots and eating tamales or tortillas that she was referring to Hispanic tenants, didn't you?

A. [Over objection] Yes.

(Tranculov Dep. at 32–34). Gary Kass, owner of the apartment building in which Tranculov worked, testified that based upon his experiences with the alderman's office and the Khamises concerning their complaints about the building and tenants, Como's Pizza, and the tenants of other buildings, it was his opinion that "to a degree" the complaints involved racial stereotyping. (Kass Dep. at 97–98). Tranculov also testified that one of the Khamis sisters (its not clear from the testimony which one) complained about conduct by minority residents that had not been complained about when done by a white resident. (Tranculov Dep. at 43–44). Also, Tranculov testified that Khamis once told her that "all of them look the same" referring to Hispanics. (*Id.* at 44).

 Paul Flynn, a manager at Como's in 1990 or 1991, stated that in late summer or fall of the year (*which* year is unclear from the record) he attended a meeting at the Zephyr restaurant, which was owned by Byron Kouris, who also owned Como's building. Present at the meeting were Flynn, Kouris, Susan Khamis, Sonja Aghakan, and Schulter. (Flynn Decl. ¶¶ 3–4). Flynn further stated that:

During the meeting, both Susan Khamis and Sonia Aghakan both made repeated complaints about the fact that our business attracted "Mexican gang-bangers" and

---

ment of the declarant's then existing state of mind, [or] emotion . . . (such as intent . . . motive . . . [or] mental feeling)." Thus, the testimony would be admissible to show the Khamises' discriminatory intent. *Cf. Madden v. Independence*

*Bank,* 771 F.Supp. 1506, 1508 n. 1 (C.D.Ca.1991) (finding statements reflecting discriminatory animus toward older employees admissible in an ADEA action as evidence of discriminatory intent).

"blacks from [the] UPTOWN [neighborhood of Chicago]" to eat there. Both Susan Khamis and Sonia Aghakan complained also about the "Mexican" and "black" tenants of the 4606 N. Hermitage [building] ... behaving like the Mexican and black patrons of Como's Pizza. One complaint both voiced was that the minority tenants of the 4606 N. Hermitage building and the minority patrons of Como's pizza littered. Sonia Aghakan and Susan Khamis specifically complained that the type of customers we attracted "brought the neighborhood down" and Sonia could "not believe the type" of customers we attracted and that Como's Pizza needed to clean up our act.

At one point in the meeting, Susan Khamis was complaining about the fact that some "Mexicans" had been out by "her curb" and that she had gone out of her house to tell them they had to leave.... Susan Khamis and Sonia Aghakan specifically said that we were attracting Mexican gang-bangers, blacks from UPTOWN, and they did not want that riff-raff in the neighborhood.

(*Id.* ¶¶ 5, 6). While acknowledging that "in any to-go restaurant such as Como's there will be an undesirable or littering customer," Flynn stated that he felt Khamis' and Aghakan's complaints about Como's minority patrons to be exaggerated and unfair. (*Id.* ¶ 7). Finally, Flynn noted that during the meeting "Schulter generally remained silent, and never disavowed Susan Khamis' and Sonia Aghakan's remarks." (*Id.* ¶ 6).[3]

---

**3.** Defendants have moved to strike Flynn's declaration as well as that of Benny Garza, an independent contractor who worked as a driver for Como's, and Byron Kouris, Como's landlord. Defendants' motion to strike these declarations is based, *inter alia*, on the fact that Flynn and Garza were never identified to the City and although Khouris was identified as a witness, his declaration was not disclosed until after the close of discovery.

Plaintiffs do not deny that these defendants were not identified to the City. Indeed, plaintiffs' counsel states, "On oath, plaintiffs['] counsel did not speak to Mr. Garza until after expiration of the discovery period." (Pls.' Resp. Defs' Mot. Strike at 4). Plaintiffs' counsel makes the same statement with respect to Mr. Flynn. (*Id.* at 5). Plaintiffs counsel explains that he did not disclose Flynn because "plaintiffs did not become aware that Mr. Flynn had relevant information until the very last days of discovery, when Suzanne Khamis (who had repeated [sic] failed to shoe [sic] for her noticed deposition), informed plaintiffs' counsel that she, defendant Schulter and Mr. Flynn had met those years ago and discussed matters relating to this case." (*Id.* at 5).

Presenting defendants with Flynn's declaration on the day that defendants' dispositive motion was due is simply unacceptable practice. The rules of discovery are designed to ensure that civil litigation does not devolve into litigation by ambush. Moreover, the whole point of the discovery process, in conjunction with a proper Rule 56 motion for summary judgment, is to determine whether there is insufficient evidence to proceed to trial. If plaintiffs are free to sit back and not thoroughly investigate their clients' claims until after the discovery process has identified all the deficiencies in their case, the purpose of Rule 56 will be thwarted. In light of the fact that plaintiffs' themselves have presented evidence of their own dating back to 1991, it is entirely reasonable to expect that they should have disclosed Como's employees dating back to that time period as witnesses with knowledge of "the incidents or injuries alleged in the complaint." (Defs.' Interrog. ¶ 5). [In fairness to the plaintiffs, it must be noted that the defendants' interrogatories are drafted in such a way as to allow, if not encourage, the sort of nondisclosure we now address.] It would be well within the Court's discretion to strike Mr. Flynn's declaration. Nevertheless the Court believes that given that Flynn was not disclosed until the last days of discovery and given the potential significance of his testimony, the interests of justice are better served by following the more prudent course of allowing Flynn's declaration into evidence. Accordingly, the Court will deny defendants' motion to strike the Flynn declaration.

As to the Kouris declaration, there is a factual dispute between the parties as to whether he was, in fact, disclosed. Although an evidentiary hearing could be held to make a factual determination as to whether plaintiffs disclosed Mr. Kouris, we find that option to be a waste of scarce judicial resources. The Court will decide this factual dispute against the City and allow the Kouris declaration into evidence.

Finally, with respect to the Garza declaration, the Court finds plaintiffs' explanation for not disclosing him (*i.e.*, that he was an independent contractor and not an employee) to be wholly insufficient. Regardless of his employment status, Garza plainly falls within the reach of defendants' Interrogatory ¶ 5 and should have been disclosed. Additionally, insofar as Garza's testimony merely provides additional evidence that Victoria Khamis made racially hostile remarks, the declaration is needlessly cumulative. For these reasons, the Garza declaration will be stricken.

Plaintiff Raul Contreras testified that once when he was walking by her house, Victoria Khamis had told him that he should not pass by the area. He also testified that, from inside Como's, he had seen Victoria apparently gesturing to other Mexicans that they should move away from in front of her house. He inferred that this is what Khamis was doing based on his prior experience with her telling him that he should not pass by her house. (R. Contreras Dep. at 24–27).

Plaintiffs seek to link the defendants with the Khamis sisters' alleged discriminatory animus through evidence relating to the Khamis' history with the City officials. Alderman Schulter testified that he first met the Khamises over 20 years ago. He met Victoria Khamis in connection with her involvement in UPRAVE. Schulter testified that he has probably spoken with her hundreds of times.[4] (Schulter Dep. at 33, 35). When asked the basis of his acquaintance with Victoria Khamis, Schulter stated "I believe it has been [a] desire to work on common issues affecting the ward." (Id. at 38). As examples of issues that he has discussed with Victoria Khamis, Schulter specifically identified the disrepair of a neighborhood YMCA building, and building code violations at the American Indian Center, the In and Out Grocery and an apartment complex located at 4606 N. Hermitage, which is next door to Como's and across the street from the Khamises' residence. (Id. at 38–43). Schulter also testified that either Suzanne or Victoria Khamis had complained to him about the cleanliness of a "pizza place" operating at the location of Como's Pizza, prior to the time that Como's began operating there. (Id. at 64–65). Schulter stated that Victoria Khamis is one of many people in the ward who is very active in bringing complaints to

his attention and that he attempts to accommodate the concerns of civic organizations in the ward, including UPRAVE. (Id. at 61–62). Victoria Khamis testified that she may have contributed to Alderman Schulter's campaign about twenty years ago but not in recent years and that UPRAVE definitely has not contributed to Schulter within the past 10 years (V. Khamis Dep. at 182): Suzanne Khamis stated that the most they have done over the years is to put a campaign sign on their door or gate when asked. (S. Khamis Dep. at 26).

Regarding his attendance at UPRAVE meetings, Schulter testified that he attends the meetings because he is asked to attend and if he cannot make it he usually sends a representative. (Id. at 24–25). Schulter's testimony regarding the number of UPRAVE meetings he has attended in recent years is somewhat unclear. When asked how many UPRAVE meetings he had attended in the last 5 years, Schulter responded "many"; yet when asked how many times Victoria Khamis had asked him to attend in the past 2 years, he responded "four or five" but added that he had only gone to about half of those personally. (Id. at 24–25). Schulter stated that the members of his staff who attended UPRAVE meetings in the last two years when he was unavailable to attend have included Ron Tindle and maybe Sonja Aghakan. (Id. at 26). Schulter testified that he had attended UPRAVE meetings when Sonja Aghakan was present.[5] (Id. at 27). Finally, Schulter testified that he has never heard Suzanne or Victoria Khamis make derogatory remarks about Mexicans. (Id. at 174).

Suzanne Khamis testified that she had complained about Como's to various City de-

---

4. One of Schulter's staff members, Ron Tindle, testified that both of the Khamis sisters called the office with complaints, and he has spoken with Victoria Khamis perhaps dozens of times about buildings or establishments with which she has had problems. (Tindle Dep. at 33).

5. When asked if she attended UPRAVE meetings in a personal capacity as a member of the community or in an official capacity as a representative of the alderman's office, Aghakan responded "personal capacity." (Aghakan Dep. at 146). She also testified that she never spoke on behalf

of Alderman Schulter at an UPRAVE meeting. However, she testified that at the end of meetings people would approach her because they knew she was from the alderman's office and ask her questions or make requests of her. She would subsequently attempt to resolve the particular issue. (Id. at 147–48). Tindle testified that at most he had attended three UPRAVE meetings. (Tindle Dep. at 34). He also testified that Aghakan had attended UPRAVE meetings as a member of the alderman's staff, with the alderman's knowledge. (Tindle Dep. at 129).

partments for years.[6] (Pls.' Add'l Facts ¶ 44). For instance, on or about October 21, 1991, an UPRAVE meeting was held at the Khamises' home. (Pls.' Add'l Facts ¶ 21). The meeting was attended by two representatives from the City of Chicago: Terry Teele, from the Mayor's office of Inquiry and Information, and Graham Grady, from the Department of Zoning. Grady's notes from the meeting reflect several problems concerning Como's that were discussed including "gangs," delivery trucks making noise early in the morning, trucks double parking, and problems relating to Como's exhaust fan and a grease pit in the alley. Gray's notes also indicate that UPRAVE was opposed to Como's. (See Pls.' Group Ex. 1). Subsequent to the UPRAVE meeting, Grady sent a memorandum to Teele listing a number of problems meriting investigation regarding the operation of Como's, including early deliveries, parking problems, the grease pit and exhaust fan, rodent control, and gang problems. (See Pls.' Group Ex. 2). The memorandum to Teele also reflects that issues of concern other than Como's were also discussed such as a problematic parking lot located at Wilson and Paulina streets, possible zoning violations by a restaurant and grocery store at Montrose and Paulina streets, and possible overcrowding at a couple of residential dwelling units. (Id.). Grady also sent a memorandum to the Commissioner of Buildings requesting his department to investigate possible building code violations at these residential dwelling units which included the multi-unit apartment complex at 4606 N. Hermitage. (Id.). The record also reflects that Grady initiated a complaint with the Department of Health concerning Como's alleged grease pit and rodent control problems. The health inspector's remarks on the complaint form indicate that the complaints were without merit. (Id.).

Como's owner, Dave Clark, testified that, over the years, he attended about four or five meetings at Alderman Schulter's office, all of which were essentially the same. (Clark Dep. at 92). In addition to Clark and Schulter (and perhaps one of Schulter's aides), either Victoria or Suzanne Khamis were also present at the meetings. (Id.). Clark testified that the topics of concern at the meetings included parking problems, the grease bin and the exhaust fan on Como's roof. (Id. at 87–92). Clark also testified that at the meetings Schulter indicated that he wanted to work things out and he seemed amenable to working with Clark. (Id. at 93). Nevertheless, Clark stated that Schulter treated him as if the Khamises were always right and Como's was always wrong. (Id. at 283).

On about May 13, 1994, Schulter organized a meeting with various City officials to discuss Como's Pizza and possibly other matters. The City had already engaged in some enforcement activity involving Como's in the weeks and months immediately preceding the May meeting called by Schulter. For instance, Sherri Cianciarulo, a project coordinator in the Department of Revenue's Compliance and Enforcement Division, testified that about one month before the meeting her department had responded to a complaint that was received from the Zoning Department concerning alleged wholesaling activity at Como's. (Cianciarulo Dep. at 13–16). A field inspection report completed by a zoning department inspector on March 30, 1994, noted that Como's was engaged in "cater[ing]" and that the premises did not have a catering license. The report recommended a referral to the Department of Revenue. (Pls.' Group Ex. 6). The zoning department's referral form that was sent to the revenue department remarked "Pizza restaurant operating catering business [with-

---

**6.** Additionally, Como's owner testified that even before Como's opened for business, Victoria Khamis introduced herself to him, told him the ways that she expected him to run a business and stated that she had gotten the YMCA closed down and that the same thing could happen to Como's. (Clark Dep. at 27–28). Similarly, Gary Kass testified that shortly after he acquired ownership of the 4606 N. Hermitage apartment complex, Victoria Khamis introduced herself to him as the head of UPRAVE and raised some complaints she had concerning the building, including the fact that the apartment complex tenants sometimes blocked her driveway with their cars. (Kass Dep. at 24). Kass also stated that Khamis complained about the fact that building janitor's daughter, who was "white, Anglo–Saxon," used to lay out in the sun in front of the building. (Id.).

out] catering license." (*Id.*). On April 28, 1994, a revenue department investigator investigated Como's to determine the type of business activity being conducted. The investigation report notes that a Como's employee stated that an increasing amount of business comes from mobile food trucks. Cianciarulo testified that she felt that the initial investigative report was incomplete and that, based on the reference to increasing business from Thunderbird trucks, the issue of wholesaling should have been looked at more thoroughly. (Cianciarulo Dep. at 41–42). Accordingly, Cianciarulo told the investigator to conduct a follow-up investigation, which involved investigation outside of the normal 8:00 a.m. to 4:00 p.m. working hours. (*Id.* at 46, 48–49). Subsequent investigation by the Department of Revenue resulted in a determination that Como's was engaged in wholesaling to Thunderbird mobile food trucks. A revenue department investigator issued a cease and desist order and a citation to Como's for engaging in food wholesaling without a license.[7] (Pls.' Group Ex. 7).

In addition to Schulter, present at the May 13 meeting were Schulter's aide Ronald Tindle, Sherri Cianciarulo and Ronald Calicchio of the Department of Revenue, Paul Woz-

nicki of the Department of Zoning, and Suzanne and Victoria Khamis. (Schulter Dep. at 116–17). At some point during the meeting, defendant Shoenberger was called and asked to attend to discuss enforcement issues.[8] (*Id.* Dep. at 130). Although the parties disagree as to whether other matters were discussed at the meeting—and, if so, to what degree (*see, e.g.,* Pls.' 12(N)(3)(a) Facts ¶ 19), there is no dispute that the Khamises discussed their complaints about Como's. Among other issues, problems associated with Como's sales to catering trucks were discussed, as were problems relating to garbage and grease.[9] (Defs.' Facts ¶ 19). Ron Tindle testified that Schulter requested that the Department of Consumer Services form a task force to investigate Como's. (Tindle Dep. at 52, 86–87). Similarly, Shoenberger testified that Schulter indicated to her that he would like her department to look into Como's and she understood that to mean that he wanted the Department of Consumer Services to conduct an investigation of Como's. (Shoenberger Dep. at 200). At no time during the meeting was there any mention of the race or ethnicity of any of Como's employees or customers. (*Id.* ¶ 20).

During, or shortly after the meeting, Shoenberger wrote a memorandum to Pat Jack-

7. Although the plaintiffs cite certain deposition testimony by Zoning Commissioner Paul Woznicki wherein Woznicki relates that he was informed by a deputy director of revenue for the City that the City does not issue Food Wholesaling licenses (*See* Pls.' Add'l Facts ¶ 50), the Court notes that section 4–5–101(35) of the Municipal Code of Chicago establishes the fees for a "Food Establishment Wholesale" license.

8. Ron Tindle testified that in the weeks before the meeting, Alderman Schulter had instructed him to get some department heads together to discuss inspections and address complaints in the neighborhood. Tindle testified that he was told to contact the zoning, consumer services, and revenue departments; he could not recall whether he was told to call the building department. Tindle stated that he had called consumer services in advance of the meeting and someone from that department agreed to attend the meeting. (Tindle Dep. at 41–44). Tindle also called Paul Woznicki, the Zoning Department Commissioner, and either Ron Calicchio or Sherri Cianciarulo from the Department of Revenue. (*Id.* at 58–60). Tindle also notified the Khamises about the meeting. (*Id.* at 45).

9. Suzanne Khamis testified that she had discussed her concerns about Como's hours of operation and the trucks that were frequenting Como's. (S. Khamis Dep. at 135). Victoria Khamis recalled that she complained of grease in Como's alley. (Pls.' Add'l Facts ¶ 74). Schulter's notes from the meeting include the following remarks:

> Como's Pizza—
> a).—dumpster in alley—
> b).—grease pit in alley—filthy
> c).—litter (should be monitored & ticketed)
> Suzanne—to call Paul Woznicki—in several wks.—when she observes the trucks coming back.

(Pls.' Group Ex. 5). Schulter's notes also indicate that a task force should be put together to investigate Como's and the following departments are noted in this regard: Environment, Health, Police, Zoning, Revenue, Sanitation, and Building. (*Id.*). The notes also state, "We can document further violations—by the respective depts.—to give them to the License Commission." (*Id.*).

> Put a task force together—
> a)—Environment
> b)—Health

owiak, a Deputy Commissioner in the Department of Consumer Services, that reads as follows:

> Please organize a task force to investigate Connie's Pizza[10]—1742 W. Wilson Ave. Please include the following Depts.:
>
> S + S [streets and sanitation]
>
> Health
>
> Revenue
>
> Zoning
>
> Bldg.
>
> ENV. [environment]
>
> CPD. [Chicago Police Department]
>
> Numerous complaints have been received from residents in the area regarding: traffic, sanitation, licensing, noise, pollution, bldg violations etc.

(Pls.' Ex. 8). Jackowiak was not specifically informed of the identity of the residents who had made the complaints. (Defs.' Facts ¶ 27). Ultimately, the Department of Health was not involved in the inspection of Como's. Shoenberger testified in this regard that Jackowiak stated to her that Arlene Lopez, a Consumer Investigator II supervisor with five years of prior experience as a sanitarian with the Department of Health (Defs.' Facts ¶ 29), had the requisite experience to conduct an inspection and that Lopez along with a Department of Consumer Services sanitarian would conduct the investigation. Shoenberger understood Jackowiak's input to be a recommendation that the Department of Health not be included in the task force, that it could be handled internally—a recommendation to which Shoenberger agreed. (Shoenberger Dep. at 139; Shoenberger Cont. Dep. at 45). Jackowiak included Como's on the next regularly-scheduled Consumer Services task force, which was scheduled for May 23, 1994. Como's was just one of several businesses inspected by the DCS task force that day. (Defs.' Facts ¶ 28).

On May 23, 1994, DCS employees Arlene Lopez and Sharon Lewis, a DCS sanitarian who transferred to DCS from the Department of Health, inspected Como's for health violations. (Defs.' Facts ¶ 29). Although Lewis was a sanitarian with the Department of Health, she never did any health sanitation inspections of restaurants while at the Department of Health; she was a court liaison who did not inspect in the field. (Pls.' Add'l Facts ¶ 117). Neither Lopez nor Lewis were informed as to who had initiated the complaint against Como's, nor were they informed as to the nature of any of the complaints lodged against any of the business. (Defs.' Facts ¶ 28).

On an inspection report form, Lopez and Lewis noted, among other things: (1) rodent droppings throughout the cooking and storage area; (2) a cross-connection between a sink in a bathroom and the ice machine; (3) no thermometers in any of the upright coolers; (4) raw hamburger meat on a counter that was an improper temperature; (5) no running water in the exposed hand-bowl (the sink in which food handlers are to wash their hands); (6) an open hole where a window had been taken out; (7) paint peeling from the walls near the three-compartment sink (where dishes are washed); and (8) standing water in the storage room. Additionally, they indicated that there was no certified food handler on the premises and that Como's did not have the food handler's license required by the City.[11] (Defs.' Facts ¶ 30).

During his deposition, Como's owner acknowledged that (1) the refrigerator was not working on the day of the inspection; (2) there was no hot water to the exposed hand-bowl, and that he had previously been warned about this problem by the Health Department; (3) overflow from the ice machine has resulted in standing water in the

---

10. [This Court's footnote]. Shoenberger had initially written "Connie's Pizza," believing that the restaurant at issue was actually a part of the Bridgeport, Illinois chain of pizza restaurants. Defs.' Facts ¶ 27. Indeed, neither Shoenberger nor Jackowiak had ever heard of Como's prior to the May 1994 meeting. (*Id.*). In the memorandum, which contains several overstrikes and corrections, the name "Connie's" was subsequently crossed out and replaced with "COMO." The

Court will not pause to detail the other edits to the memorandum which we deem to be immaterial.

11. The plaintiffs deny that any of the alleged violations actually existed, and/or they deny that any of the alleged findings warranted closure of Como's. (Pls.' 12(N)(3)(a) Facts ¶ 30).

rear storage room in the past, and Como's had been told previously by the Health Department that the floor needed repair due to water; (4) there were thermometers missing from 2 coolers and that missing thermometers can be a problem because food establishments are required to keep meat at certain temperatures; (5) one month before the DCS inspection, the Department of Health gave Como's 10 days to replace a missing thermometer in the reach-in cooler; also during that prior inspection the Department of Health noted other violations that were to be corrected within 10 days, including greasy conditions, dirty floors, absence of hair nets on food handlers, and the poor repair of a side wall; (6) the window in the rear of the building was completely missing and the screen in poor repair; (7) there was paint peeling from the wall; (8) he had received prior reports from the Department of Health about peeling paint, broken or missing tiles and the dirty condition of the floor; on one prior inspection, the inspector noted that Como's was a "commissary to mobile food trucks (thunderbird)" and instructed Como's manager to label and individually wrap all food; (9) he had previously been warned by Health to clean the walk-in cooler and the interior of the ice machine; (10) at the time of the DCS inspection, no one employed by Como's had a City of Chicago food handler certificate or had even enrolled in the required course to obtain such a certificate; the Department of Health had previously issued Como's a citation for its failure to have a food handler certificate. (Defs.' Facts ¶ 31).

As a result of the inspection, DCS issued 5 citations to Como's for (1) unsanitary equipment, (2) improper pest control, (3) unsanitary interiors, (4) inadequate temperature of raw meat, and (5) having no food sanitarian certificate on the premises. (Defs.'s Facts ¶ 32). While plaintiffs admit that the cita-

tions were issued, they contest the validity of the citations. And, although Clark acknowledged the problems just described, he takes issue with many aspects of the inspectors' report, both as to the existence of various conditions and as to their seriousness, and maintains that even to the extent that violations existed, they did not warrant a shutdown.

After Lopez and Lewis had conducted their inspection and determined that Como's should be immediately closed because it posed an imminent health hazard, Lopez telephoned her supervisor, pursuant to DCS practice, to obtain authorization to close the restaurant. Both Commissioner Shoenberger and Isabel Esparza, an Assistant Commissioner with over 15 years of experience with DCS,[12] authorized the closure and Como's was closed until such time as it could come into compliance. As a courtesy, Lopez called the Department of Health and left a message with Sam Brown to inform him that DCS was closing Como's. (Defs.' Facts ¶ 33). Several hours after the DCS inspection, Brown instructed Robert Henry, a Health Department inspector, to go to Como's to see what was going on. (Henry Dep. at 20–23). Henry, testified that, although he did not conduct an inspection, he did not see anything that warranted a closure. (Id. at 32). Henry's inspection report notes "premise had violations, but not warranting close-up." (Pls.' Ex. 16).

The next day, May 24, 1994, Stephen Mazar, an exterminator hired by Clark after the DCS inspection, inspected Como's. Prior to arriving at Como's, Mazar instructed Clark to vacuum the entire restaurant before the inspection. Mazar testified that Como's was thoroughly vacuumed before he arrived. Mazar stated that he did not find any evidence of a rodent problem but with all the cleaning that had occurred prior to his arriv-

12. Esparza testified that since about 1980 she has served in various capacities with DCS including Consumer Investigator II for 5 years (during which time she was cross-trained in health and licensing violations and participated in health inspections of food purveyors such as grocery stores), Supervisor of Consumer Investigators for about 4 years (during which her primary responsibilities involved assigning work to

investigators, checking their work, and occasionally conducting field inspections), and DCS Manager (wherein she supervised both investigators and supervisors). (Esparza Dep. at 10–15). Notwithstanding her experience, plaintiffs maintain that Esparza lacked the minimum requirements of Sanitarian I. (Pls.' 12(N)(3)(a) Facts ¶ 33; Pls.' Add'l Facts ¶ 103).

al it might have been eradicated. (Mazar Dep. at 40). Mazar did find a lot of fresh rodent droppings on the bottom window sills of a building across the alley from Como's and he plugged three 2–3 inch holes in the base of Como's building that could potentially have given Como's a rodent problem. (Defs.' Facts ¶ 34; Mazar Dep. at 35–36).

On May 25, 1994, two DCS employees, Margie Rivera and Anyce Cullars were dispatched to re-inspect Como's. Margie Rivera testified that in her opinion, at the time of re-inspection, Como's needed more time to comply with the prior inspection orders. (Rivera Dep. at 57, 60). Rivera found that more work was required to rodent-proof a door and that there was a hole in the ceiling that was not rodent proof. (Rivera Dep. at 54). The re-inspection report notes that many corrective measures had been taken (Defs.' Append. Exs. at 53), however several orders had not been complied with to a satisfactory degree. (*Id.* at 52). In particular, various pieces of equipment still required cleaning or painting, a rear door needed to be repaired to rodent-proof it, excessive amounts of rodent droppings were reported to be present behind the upright freezer, garbage receptacles needed proper lids, water was still leaking from the exposed bowl and three-compartment sink, the ceiling required repair, and the floors were still in the process of being repaired. (*Id.*). Rivera called DCS and spoke with Pat Jackowiak about whether Como's should remain closed. (Rivera Dep. at 57). Rivera stated that the decision to keep Como's closed was "a judgment call" and that in her opinion Como's needed more time to comply. (*Id.* at 60).

After Rivera and Cullars left, Mazar returned and found small dark particles that resembled rodent droppings in the areas referred to in the re-inspection report. (Mazar Dep. at 53–57). The particles turned out not to be rodent droppings at all but rather were mop particles that had become encapsulated by flooring adhesive. (*Id.* at 55–56). The next day, May 26, 1994, Como's was permitted to reopen. (Defs.' Facts ¶ 38). In October of 1994, Como's closed permanently.

A significant amount of plaintiffs' evidentiary showing is directed at establishing that the inspection of Como's was highly irregular in the sense that it was conducted by the Department of Consumer Services as opposed to the Department of Health. Indeed, plaintiffs contend that DCS sanitarians are not authorized to inspect or close down a restaurant.

Chapter 4–8 ("FOOD SANITATION") of the Municipal Code addresses licensing and sanitary requirements of food establishments. Section 4–8–060 provides in pertinent part:

> The department of health shall inspect all retail food establishments, food-dispensing establishments, . . . at least once every six months and as often as necessary to determine that the requirements of this Municipal Code are being complied with.

CHICAGO MUNICIPAL CODE § 4–8–060(a). Paragraph (c) of this section provides in relevant part:

> When the department of health finds a violation of any requirements of this Municipal Code relating to health and sanitation, it may make a second inspection after a lapse of whatever time it deems necessary for the correction of the violations; however, whenever an inspection indicates that the conditions in the food establishment create an imminent hazard to the public health, the license may be immediately suspended.

CHICAGO MUNICIPAL CODE § 4–8–060(c).

In 1992, the Municipal Code was amended to include, *inter alia,* Chapter 4–8–075 ("Food Sanitarians"), which states:

> Any food sanitarian employed by the city of Chicago shall be empowered to enforce applicable provisions of this chapter. The mayor may designate one or more departments to supervise the activities of food sanitarians.

CHICAGO MUNICIPAL CODE § 4–8–075. While the Code does not define "food sanitarian," the City's November 1989 employment description for a sanitarian includes:

> conduct[ing] routine inspections of food and dairy processing, dispensing and purveying establishments in an assigned geographic area to ensure that State and local

**1386**

laws concerning public health and licensing requirements are adhered to . . . .

(Defs.' Facts ¶ 24).

In 1993, the mayor designated five sanitarians to work for the Department of Consumer Services. While the parties agree that five sanitarians were transferred from the Department of Health to the Department of Consumer Services, the parties dispute whether the inspection and closure of Como's Pizza by such DCS sanitarians was contemplated by the Code and thus authorized.

Shoenberger testified that Como's Pizza was not the first food dispensing establishment that DCS investigated. (Shoenberger Dep. at 185). She stated that since her appointment as commissioner, numerous food dispensers have been the subject of a Department of Consumer Services Task Force, including a donut shop on the South side, a submarine shop on the west side, various delis, and several grocery stores that sell prepared food. (Shoenberger Dep. at 4–5, 185). Similarly, Jackowiak testified that she did not think that the DCS task force inspection of Como's was in any way unauthorized. (Jackowiak Dep. at 192). Jackowiak testified that in the past she had discussed the issue of inspections of food establishments with Ken Pannaralla from the Department of Health and it was her understanding that Health would inspect "larger restaurants" and DCS would "do the delis, bakeries, fast food." (*Id.* at 76). She also clarified that to the best of her recollection "larger restaurant" meant one with a sit-down dining room. (*Id.* at 76–77).

Health Department Commissioner Sheila Lyne testified she had had conversations with Commissioner Shoenberger at about the time of the transfer of sanitarians from Health to DCS and that she recalled that restaurants would primarily be the responsibility of the Health Department but the DCS would do delis and grocery stores. (Lyne Dep. at 17–18, 20). However, Lyne also stated that "if [DCS was] in a restaurant for some reason, they would have the authority to do the inspection there." (*Id.* at 20). Dr. John Wilhelm, Deputy Commissioner for the Department of Health, also testified that he believed that the Department of Consumer

Services was authorized to close a restaurant on sanitary grounds. (Wilhelm Dep. at 8). He testified that he believed that this authority was granted when Department of Health sanitarians were transferred to the Department of Consumer Services in January of 1994. (Wilhelm Dep. at 10–11). Wilhelm stated in his deposition, "[W]hen we transferred sanitarians to the Department of Consumer Services, it was with the understanding that they would carry with them the authority to do what sanitarians do, and that is inspection, site violations, and all the way to closure." (Wilhelm Dep. at 101–02). Given this authority, and despite the fact that he knew of no other case in which a food dispensing establishment was closed by the Department of Consumer Services, Wilhelm testified that he was not surprised that Como's Pizza was closed by the Department of Consumer Services for sanitary violations. (Wilhelm Dep. at 25–26). Wilhelm testified that it was never envisioned that the sanitarians transferred to the Department of Consumer Services would have to call the Department of Health to perform their duties. (Wilhelm Dep. at 105).

Nevertheless, Kenneth Pannaralla, the Chief Sanitarian for the Department of Health, testified that he thought it was unusual that the Department of Consumer Services closed Como's without the participation of the Department of Health. (Pannaralla Dep. at 43). He stated that it was the first case, to his knowledge, of a restaurant being closed by the Department of Consumer Services without the cooperation of the Department of Health. (*Id.* at 43–44).

## ANALYSIS
### *Summary Judgment Standards*

■■■ Summary judgment is proper only if the record shows there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c); *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 477 (7th Cir.1995). A genuine issue for trial exists only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must review all in a light most favorable to the nonmoving party, *Griffin v. City of Milwaukee,* 74 F.3d 824 (7th Cir.1996), and draw all inferences in the nonmovant's favor. *Id.; DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 189 (7th Cir.1995). However, if the evidence is merely colorable, or is not significantly probative or merely raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. at 2516; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Johnson,* 70 F.3d at 477. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

Where cross-motions for summary judgment have been submitted, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. U.S.,* 996 F.2d 1455, 1461 (2d Cir. 1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id.; Buttitta v. City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), aff'd, 9 F.3d 1198 (7th Cir.1993).

*Section 1983 Claims*

Count I of plaintiffs' second amended complaint purports to state claims for civil rights violations under 42 U.S.C. § 1983. Although neither the complaint nor the plaintiffs' memoranda clearly articulate the precise nature of the asserted claims, it is apparent that the plaintiffs' § 1983 claims are predicated on underlying violations of their First, Fourth, and Fourteenth Amendment rights. *See* Sec. Amend.Compl. ¶ 5 (alleging that this case

arises under these amendments and § 1983). The Court shall address these claims individually below.

1. *First Amendment Claim*

The plaintiffs' First Amendment claim, brought specifically by the employee-plaintiffs, alleges that the defendants' actions in investigating and closing Como's infringed their "constitutionally protected right to freely associate." Sec.Amend.Compl. ¶ 29. This bare-bones allegation is left largely undeveloped in plaintiffs' memorandum in opposition to the defendants' motion for summary judgment. Indeed, plaintiffs do not cite a single case in support of their First Amendment claim. Instead, they offer the following entreaty:

> [T]he individual plaintiffs believe that their First Amendment rights may have been violated[.] The Supreme Court has recognized a freedom to associate with others "to pursue goals independently protected by the First Amendment—such as political advocacy, litigation ... or religious worship." L. Tribe, American Const.Law 702 (1978). Surely, plaintiffs have been deprived of association more meaningful than that which regularly occurs between young men and women at a social dance hall.[13] It is the very nature of plaintiffs' national origin and ancestry which means that their association is intimate when discussing cultural affairs. The employee plaintiffs were deprived of this, as they cannot easily, if at all, see friends and customers who shared these interests with them, whether it be shared religion, or talking with friends who were vendors in the area that shared their heritage or origin. Without apologies, plaintiffs contend that such matters ought to be protected where, as here, the clear discriminatory link to the cause for their inability to continue such association, is based upon invidious discrimination.

Pls.' Resp. Defs.' Mot.S.J. at 28–29 (emphasis omitted). As is apparent from the absence of any supporting authority in the foregoing passage, plaintiffs' position is without merit.

---

**13.** [This Court's footnote]. The reference here is plainly an allusion to *Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (upholding the constitutionality of a Dallas licensing ordinance placing age and hour restrictions on certain dance halls).

■■■ "[T]he First Amendment does not in terms protect a 'right of association,'" however, the Supreme Court has "recognized that it embraces such a right in certain circumstances." *City of Dallas v. Stanglin,* 490 U.S. 19, 23–24, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18 (1989). As the Court explained in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), a constitutionally protected right of association has been recognized where association is "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. at 3249. In short, First Amendment protection does not extend to "opportunities of association that do not pertain to expressive association, even if they might be described as 'associational' in common parlance." *Glatt v. Chicago Park Dist.,* 847 F.Supp. 101, 104 (N.D.Ill.1994); *see also Swank v. Smart,* 898 F.2d 1247, 1252 (7th Cir.) (noting that it would be erroneous to suggest that the First Amendment protects nonexpressive association), *cert. denied,* 498 U.S. 853, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990). This Court has scrutinized the record in this case and has not found a shred of evidence that the "association" that has allegedly been impeded here involved association "for the purpose of advancement of beliefs and ideas." *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). Plaintiffs have not even attempted to direct this Court to any evidence in the record (and the Court has found none on its own) that the interactional encounters that took place at Como's involved anything more than the usual casual conversation between friends and acquaintances that occurs at any food establishment. As the Seventh Circuit observed in *Swank:*

> Casual chit-chat between two persons or confined to a small social group is unrelated, or largely so, to [the marketplace of ideas], and is not protected. Such conversation is important to its participants but not to the advancement of knowledge, the transformation of taste, political change, cultural expression, and the other objectives, values, and consequences of the speech that is protected by the First Amendment.

898 F.2d at 1251. As the Supreme Court noted in *Stanglin,* "we do not think the Constitution recognizes a generalized right to 'social association.'" 490 U.S. at 25, 109 S.Ct. at 1595. Moreover, contrary to plaintiffs' suggestion, the fact that the parties to a social conversation happen to share the same national origin or ancestry does not transform the conversation into an "intimate association" nor does it, in and of itself, transform the contents of the conversation into expressive association that is entitled to protection; the reach of First Amendment protection is not determined by the race or national origin of the speaker. We are aware of no authority holding that informal social encounters constitute "cultural expression" simply because the participants share the same national origin. Because there is no evidence upon which a factfinder could conclude that the employee plaintiffs engaged in expressive association at Como's that has been impeded by the defendants' actions, defendants are entitled to judgment as a matter of law on plaintiffs' First Amendment claims.

### 2. *Fourth Amendment Claim*

Plaintiff Clark contends that the inspection of Como's by DCS sanitarians violated his Fourth Amendment right against unreasonable searches. In addressing Clark's Fourth Amendment claim, it is important to bear in mind from the outset that Clark does not purport to challenge the constitutionality *per se* of an administrative inspection pursuant to the Chicago Municipal Code for purposes of determining compliance with the City's food and sanitation ordinances. Rather, Clark's Fourth Amendment challenge is predicated solely on the fact that the sanitarians that inspected Como's were employed by the Department of Consumer Services, not the Department of Health. *See, e.g.,* Pls.' Resp. Defs.' Mot.S.J. at 21. It is evident from Clark's arguments that he would not be asserting a Fourth Amendment claim had the sanitarians that visited Como's on May 23, 1994, been employed by and dispatched from the Department of Health. As we explain

below, we find Clark's arguments to be unpersuasive.

■■■■ The Fourth Amendment's prohibition against unreasonable searches and seizures applies to administrative searches of commercial premises such as Como's that are designed to enforce regulatory schemes such as municipal health and building codes. *New York v. Burger,* 482 U.S. 691, 699–700, 107 S.Ct. 2636, 2642–43, 96 L.Ed.2d 601 (1987); *see also Lesser v. Espy,* 34 F.3d 1301, 1305 (7th Cir.1994). Nevertheless, it has long been recognized that the expectation of privacy concerning commercial premises held by the owner of a "closely regulated" business is an attenuated one. *Burger,* 482 U.S. at 700–01, 107 S.Ct. at 2642–43 (junkyard industry); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor industry); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (pawnshop licensed to sell firearms); *Lesser,* 34 F.3d at 1305 (rabbit breeding). The food industry has long been held to be such a closely regulated industry, *see, e.g., United States v. New England Grocers Supply Co.,* 488 F.Supp. 230 (D.Mass.1980); *United States v. Acri Wholesale Grocery Co.,* 409 F.Supp. 529 (S.D.Iowa 1976), and Clark does not argue to the contrary.

■■■ In *Burger,* the Court explained that in view of the diminished privacy expectations of the owner or operator of closely regulated commercial premises, "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search ... have lessened application in this context[,]" and "as in other situations of 'special need,' ... a warrantless inspection of commercial premises may well be reasonable within the Fourth Amendment." 482 U.S. at 702, 107 S.Ct. at 2643–44. The Court proceeded to set out three criteria that must be met in order for a warrantless inspection pursuant to a regulatory scheme to be reasonable: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) the regulatory inspection program "[must] provid[e] a constitutionally adequate substitute for a warrant." *Id.* at 702–03, 107 S.Ct. at 2644. With respect to the third criterion, the Court explained:

[T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.... To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

*Id.* at 703, 107 S.Ct. at 2644 (internal quotation marks and citations omitted). With these standards in mind, we consider Clark's arguments.

■■■ As an initial matter, the Court finds that the City's regulation of the food industry is "pervasive." As explained by the Seventh Circuit in *Lesser,* "[g]overnmental regulation is 'pervasive' if the regulatory presence is so comprehensive and defined that the business owner cannot help but be aware that his commercial property will be subject to periodic inspections undertaken for specific purposes." 34 F.3d at 1306. That condition is plainly met here and Clark does not argue to the contrary. Similarly, Clark does not dispute that there is a substantial governmental interest underlying the City's food and sanitation regulations, *see* Pls.' Resp. Defs.' Mot.S.J. at 19 ("defendants are correct that the city has a substantial governmental interest in enforcing health and sanitation requirements in restaurants"), and this Court finds that a substantial governmental interest does indeed exist. As the court observed in *United States v. Business Builders, Inc.,* 354 F.Supp. 141, 143 (N.D.Okla.1973), "[i]t would be an affront to common sense to say that the public

interest is not as deeply involved in the regulation of the food industry as it is in the liquor and firearms industries." *Cf. North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (upholding the constitutionality of a Chicago ordinance that allowed for the seizure and destruction of unwholesome food without a prior hearing, and noting that contaminated food is "a nuisance of the most dangerous kind, involving, as it does, the health, if not the lives, of persons who might eat it").

The Court also finds that the second *Burger* requirement—*viz.,* that warrantless inspections are necessary to further the regulatory scheme—is also met with respect to the City's health and sanitation regulation of food establishments. In *Donovan v. Dewey,* 452 U.S. 594, 603, 101 S.Ct. 2534, 2539–40, 69 L.Ed.2d 262 (1981), the Supreme Court recognized that forcing mine inspectors to obtain a warrant before an inspection might alert mine operators to the impending inspection, thereby providing easy opportunity to conceal existing violations and frustrating the objectives of the Mine Safety and Health Act. In a similar fashion, this Court concludes that requiring City inspectors to obtain a warrant or provide notice to owners prior to conducting a health or sanitation inspection could seriously frustrate enforcement of the City's health and sanitation ordinances. Advance knowledge of an impending health inspection would provide restaurant owners with the opportunity to take temporary remedial measures designed to mask or conceal violations (for example, vacuuming rodent droppings) that would surely undermine the purposes of the City's health and sanitation ordinances. Clark's argument that warrantless inspections by DCS sanitarians are not necessary to further the regulatory scheme because health department sanitarians are authorized to conduct such searches, is misplaced. For purposes of this threshold inquiry as to whether warrantless administrative searches are necessary to further the City's regulatory objectives, the question of who is to perform the searches is immaterial. Rather, the pertinent inquiry is whether the City's objectives would be frustrated by requiring a warrant or notice. *See McCabe v. Life–Line Ambu-*

*lance Serv., Inc.,* 77 F.3d 540, 549–50 (1st Cir.1996) (noting that the determination as to whether an administrative search falls within the "special need" exception to the probable cause and warrant requirements must focus on systemic considerations relating to whether a regulatory scheme would be frustrated by a warrant requirement rather than being based on a case-by-case analysis of whether a warrant was feasible under the particular circumstances). As stated above, we conclude that they would be.

Next, we consider whether the City's regulatory inspection program provides a constitutionally adequate substitute for a warrant. *Burger* teaches that the Court's first inquiry in this regard should be whether the City's health and sanitation ordinances are " 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.' " 482 U.S. at 703, 107 S.Ct. at 2644 (quoting *Dewey,* 452 U.S. at 600, 101 S.Ct. at 2539). If they are, we may conclude that they sufficiently advise the owner that the search "is being made pursuant to the law and has a properly defined scope." *Id.* We find this requirement to be fully satisfied by the City's health and sanitation ordinances.

Title 4 (Businesses, Occupations and Consumer Protection), Division II (Businesses Involving Food Products) of the Chicago Municipal Code extensively and comprehensively regulates businesses involving food products. The type of food-dispensing establishment license under which Como's operates is established under Chapter 4–8 of the Municipal Code. Chapter 4–8 (Food Sanitation) in conjunction with Chapter 4–9 (Care of Foods) govern Como's business. Chapter 4–8 includes numerous provisions relating to inspections and sanitary requirements (§ 4–8–050); specific food requirements (§ 4–8–070); food handler requirements (§ 4–8–090); control of vermin and insects (§ 4–8–100); equipment standards (§ 4–8–110), and many other matters. Chapter 4–9 sets out provisions relating to care of foods. The Municipal Code contains

several provisions alerting food-establishment owners that their businesses are subject to inspection by City agents. For example, § 4–8–050(a) provides in pertinent part: "It shall be the duty of every owner to permit a representative of the department of health, after proper identification, to enter at any reasonable time and make inspections of the facilities, equipment and vehicles for determining compliance with the requirements of this Municipal Code relating to health and sanitation" and § 4–8–060(a) provides in pertinent part: "The department of health shall inspect all ... food dispensing establishments ... at least once every six months and as often as necessary to determine that the requirements of this Municipal Code are being complied with." Similarly, § 4–9–030 states, "[e]very keeper of a ... retail food establishment ... shall allow duly authorized inspectors and employees of the department of health to inspect freely and fully any food sold and shall answer all reasonable and proper questions asked by such officers relative to the condition thereof and of the places where such articles may be." *See also* MUNICIPAL CODE OF CHICAGO § 4–9–150 [Meat Compliance] ("The department of health shall make such inspections as are necessary to insure compliance with this section."). In view of the comprehensive scheme set out in Chicago's Municipal Code, this Court has little difficulty concluding that an owner of a food establishment "cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes," *Burger,* 482 U.S. at 703, 107 S.Ct. at 2644, and that the inspections are not discretionary acts of City agents but are conducted pursuant to City ordinance.

■ Before concluding that the City's regulatory inspection program provides an adequate substitute for a warrant requirement, we must also inquire into whether inspections authorized under the Municipal Code have a properly defined scope and that the discretion of the inspecting officers is limited in terms of time, place and scope. *Burger,* 482 U.S. at 703, 107 S.Ct. at 2644. As quoted above, § 4–8–050 requires owners to permit inspections "at any reasonable time" and limits inspections to "inspections of the facilities, equipment and vehicles for determining compliance with the requirements of this Municipal Code relating to health and sanitation." We find these provisions to sufficiently limit the scope of inspection.[14]

■ Clark's argument that the May 23 inspection fails to pass constitutional muster because it was conducted by DCS sanitarians rather than Health Department sanitarians is without merit. While Clark is unquestionably correct in observing that all of the above-quoted provisions of the Code speak in terms of the Health Department, the Code was expressly expanded by § 4–8–075 which gives owners fair notice that sanitarians from departments other than Health may conduct inspections to enforce the health and sanitation provisions of the Code. Indeed, Clark is virtually silent as to § 8–4–075 (Food Sanitarians) of the Municipal Code, which provides as follows:

> *Any* food sanitarian employed by the City of Chicago shall be empowered to enforce applicable provisions of this chapter. The mayor may designate one or more departments to supervise the activities of food sanitarians.

CHICAGO MUNICIPAL CODE § 8–4–075 (emphasis added). The record reflects that this provision was enacted at about the same time that a City appropriations bill was passed which allocated funds for 5 Sanitarian I positions[15] in the Department of Consumer Services. Unfortunately, the Municipal Code does not define "food sanitarian." Nevertheless, § 4–8–075 explicitly states that *any* food sanitarian employed by the City of Chi-

---

14. The only arguable concern here is the language requiring owners to allow inspection "at any reasonable time." However, since Clark has not challenged the ordinance on that ground we need not consider it here. Moreover, there is no evidence in the record that the inspection at issue was taken at an unreasonable time.

15. The job description for a Sanitarian I position provides that the position involves "routine inspections of food and dairy processing, dispensing and purveying establishments ... to ensure that State and local laws concerning public health and licensing requirements are adhered to." Defs.' App. at 3.

cago may enforce the food sanitation provisions. This provision also provides notice that such sanitarians may, at the Mayor's discretion, operate out of one or more departments. Therefore, Clark's suggestion that the only health inspection authorized by the Municipal Code is one conducted by sanitarians from the Department of Health must be rejected. Section 4–8–075 puts owners of food-dispensing establishments on fair notice that sanitarians from departments other than the Department of Health are empowered to enforce the food sanitation provisions of the Code. It is also worth noting here that there is no evidence in the record that the DCS sanitarians exceeded the proper scope of a health inspection as authorized by the Municipal Code. *See Beverly California Corp. v. Shalala,* 78 F.3d 403, 408–09 (8th Cir.1996) (rejecting claim that a nursing home inspection violated the Fourth Amendment because it was conducted by federal representatives from the Regional Office of the Health Care Financing Administration rather than state medicaid agents).

 Finally, to the extent that Clark contends that DCS sanitarians are unqualified, lack proper certification, and do not meet various State requirements [16], we conclude that these issues implicate only state-law concerns, not Fourth Amendment rights. Accordingly, for all of the foregoing reasons, we conclude that defendants are entitled to judgment as a matter of law as to Clark's Fourth Amendment claim.

### 3. *Fourteenth Amendment Claims*

As their final constitutional hook, the plaintiffs assert that their rights under the Fourteenth Amendment have been violated. In this regard, plaintiffs invoke rights arising under both the Due Process Clause of the Fourteenth Amendment as well as the Equal Protection Clause. We address these claims in turn below.

### (a.) *DUE PROCESS*
#### (i.) *Procedural Due Process*

In what appears to be an abundance of caution and adherence to the maxim that "a good defense is a good offense," defendants have briefed the issue of their entitlement to judgment as a matter of law insofar as plaintiffs might be asserting a procedural due process claim under the Fourteenth Amendment. We characterize the defendants' efforts in this regard as arising out of an abundance of caution because, having closely read plaintiffs' second amended complaint, the Court finds that the complaint completely fails to even attempt to state a procedural due process claim. Although the complaint contains a number of allegations implicating First Amendment, *see, e.g.,* Sec.Am.Compl. ¶¶ 27, 29, 31, equal protection, *see, e.g., id.* ¶¶ 27, 29, 30, 31 and, perhaps, substantive due process concerns, *see, e.g., id.,* none of these allegations provides fair notice of a procedural due process claim.

 Significantly, absent from the complaint are any allegations regarding the adequacy of pre- or post-deprivation proceedings available to the plaintiffs. While plaintiffs complain, for example, that "Como's Pizza and Clark share the right to have the regulation of their business accomplished in a manner consistent with promulgated law," *id.* ¶ 31, this nebulous allegation does not even remotely suggest that plaintiffs have inadequate state law remedies available to them. And, as the Seventh Circuit recently affirmed, failure to plead that available state law remedies are inadequate may result in the dismissal of a procedural due process claim. *Doherty v. City of Chicago,* 75 F.3d 318, 323–25 (7th Cir.1996).

Of course, in the instant case, we are beyond the pleading stage and at this point we are required to address plaintiffs' evidentiary and/or legal showing (*see* summary judgment standards *supra* ). However, plaintiffs have made virtually no effort to develop a proce-

---

**16.** In this regard, Clark argues as follows:

The city is not complying with the State's rules ... if DCS is cryptically, with lack of qualifications and reporting to the State, regulating and closing food establishments. The disclosure requirements, training requirements, registra-

tion and certification requirements, and myriad requirements the State has imposed on the city for the protection of the public are not satisfied by DCS health/food sanitation regulation, and the city knows it.

Pls.' Resp.Defs.' Mot.S.J. at 20.

dural due process claim in response to defendants' motion for summary judgment. Plaintiffs' oversized 31 page brief contains only three sentences bearing directly on procedural due process. And, as we shall explain below, these sentences reflect a misunderstanding of a procedural due process claim. In particular, plaintiffs maintain:

> The deprivation of plaintiff's process was both procedural and substantive. The deprivation was procedural because none of the pre-deprivation procedures of the Health Code or the state rules were respected, given that DCS had no authority to engage in the action it did.

Pls.' Resp. Defs.' Mot.S.J. at 25. Notably, and tellingly, absent is any citation to any pertinent authority regarding procedural due process. Despite plaintiffs' failing, the Court will examine the requirements of viable procedural due process claim in order to satisfy itself that plaintiffs have failed to meet their burden in opposing defendants' motion for summary judgment as to this claim.

■■■ As the Seventh Circuit explained in *Doherty*: "Procedural due process claims require a two step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." 75 F.3d at 322. For purposes of deciding this motion, the Court shall assume that Clark has been deprived of a protected interest through the temporary suspension of his restaurant license. *See Easter House v. Felder*, 910 F.2d 1387, 1395 (7th Cir.1990) (en banc) (finding that an adoption agency had a property interest in the renewal of its license), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991); *Reed v. Village of Shorewood*, 704 F.2d 943, 948–49 (7th Cir.1983) (finding that a liquor license gives rise to protectible property interest). Accordingly, we turn directly to a consideration of what process is due and whether Clark has been deprived of that process.

■■■ The Supreme Court has repeatedly stated that procedural due process is "a flexible concept that varies with the particular situation." *Zinermon v. Burch*, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990); *see also Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (" 'Due process is flexible and calls for such procedural protections as the particular situation demands,' " quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). While the "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *Doherty*, 75 F.3d at 323, the state is not always required to provide that opportunity prior to effectuating a deprivation of property. *Id.*

■■■ Notably, in *North American Cold Storage v. City of Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the Court upheld Chicago's right to seize and destroy potentially contaminated food without a pre-seizure hearing, recognizing that the possibility of a wrongful deprivation was outweighed by the possibility of a public health emergency and the fact that adequate postdeprivation process was available. *See also Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (upholding summary seizure and destruction of drugs without a predeprivation hearing). Thus, there can be little genuine dispute that where matters of public health or safety are involved, the State may act first and ask questions later without offending the Due Process Clause. "Not even an informal hearing ... must precede a deprivation undertaken to protect the public safety." *Caine v. Hardy*, 943 F.2d 1406, 1412 (5th Cir.1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). As the Court explained in *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1980), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), "necessity of quick action by the State ... when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." The Court has further noted that either "a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Zinermon*, 494 U.S. at 128, 110 S.Ct. at 984.

The temporary suspension of Clark's license by the DCS sanitarians plainly falls within the public health or safety class of due process cases; therefore, we find that the Due Process Clause requires no more than adequate postdeprivation process.

■ We further note that in addition to situations involving the necessity of quick action by the State, the Supreme Court has also recognized that adequate postdeprivation process may be all that is required in cases involving "random and unauthorized acts[s]," including intentional acts, by government officials. *See Parratt*, 451 U.S. at 539–44, 101 S.Ct. at 1914–17; *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984) ("An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the Due Process Clause if a meaningful postdeprivation remedy for the loss is available."). Thus, for example, in *Doherty*, where the plaintiff presented claims that the defendants had acted with an improper purpose in denying her application for a zoning certificate to operate a bingo hall and had improperly closed a different bingo hall that she operated for operating without a proper license, the Seventh Circuit observed that "it is clear from Ms. Doherty's complaint that the deprivation she complains of occurred, if at all, as the result of 'random and unauthorized' acts[,] [a]ccordingly, she was entitled only to postdeprivation remedies." 75 F.3d at 324. Following *Doherty*, to the extent that plaintiffs allege that defendants Schulter and Shoenberger's conduct was motivated by a discriminatory or otherwise improper political purpose, this Court concludes that Clark's deprivation was the result of random and unauthorized acts. So, for this reason as well as the fact that the temporary suspension of Clark's license involves a matter involving the necessity of quick action by the City, we find that the Due Process Clause is not offended so long as Clark has adequate postdeprivation process available to him.

Clark has eschewed any discussion of these principles or any discussion of the postdeprivation process available to him. Instead, as with the Fourth Amendment claim asserted by the plaintiffs, Clark's focus is solely on the fact that sanitarians dispatched by DCS rather than the Department of Health caused Como's to be temporarily closed down: "The deprivation was procedural because none of the pre-deprivation procedures of the Health Code or the state rules were respected, *given that DCS had no authority to engage in the action it did.*" Pls.' Resp. Defs.' Mot.S.J. at 25 (emphasis added). As the foregoing discussion should make clear, Clark's focus on the "pre-deprivation procedures" is misplaced; the pertinent procedural due process question here concerns the adequacy of postdeprivation remedies. And, on this issue Clark has remained completely silent. As the Seventh Circuit has observed on several occasions, "[i]t is not the role of this court to research and construct legal arguments open to the parties, especially when they are represented by counsel.'" *Doherty*, 75 F.3d at 324 (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir.1986), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 933, 93 L.Ed.2d 984 (1987)). Accordingly, because Clark has made no showing whatsoever regarding the inadequacy of state regulatory or common-law remedies, we must conclude that defendants are entitled to judgment as a matter of law on Clark's procedural due process claim.

### (ii.) *Substantive Due Process*

Clark also argues that the inspection and shut-down of Como's by DCS sanitarians constituted a violation of his substantive due process rights because it amounted to an arbitrary and unreasonable interference with his right to operate his business that bore no substantial relation to the public health and safety. *See* Pls.' Resp.Defs.' Mot.S.J. at 23–26. Once again, the heart of Clark's attack goes to the fact that DCS sanitarians rather than Health Department sanitarians inspected and shut-down Como's. Clark's premise is that DCS sanitarians are simply not competent to conduct health code inspections of restaurants; and, based on this premise he invokes a "failure to train" or "deliberate indifference" theory.

■ The "failure to train" and "deliberate indifference" theories of municipal liability are intertwined, for, as the Supreme Court

explained in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), section 1983 inadequate training claims "can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392, 109 S.Ct. at 1206. The Seventh Circuit has instructed that before a finding of deliberate indifference may be reached, there must be a showing that the defendant was "on notice of a pattern of constitutional violations resulting from the inadequate training" and "this notice of violations would have to show that the failure to provide further training was tantamount to a deliberate or conscious decision on the part of the defendant[ ] to allow the violations." *Hirsch v. Burke,* 40 F.3d 900, 904 (7th Cir.1994); *see also Cornfield v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir.1993). Such a showing is entirely absent in the instant case.[17]

■■■ There is not a shred of evidence in this case of a pattern of poorly conducted inspections and/or improper shut-downs by DCS sanitarians. Indeed, other than Clark's complaints regarding the shut-down of Como's, the record is devoid of any evidence that DCS sanitarians have ever improperly applied the food sanitation provisions of the Municipal Code, let alone have a pattern of such misapplications. Indeed, although Clark self-servingly denies that the violations found at his restaurant warranted immediate closure of Como's, he does not deny that many of the violations cited by the DCS

inspectors actually existed. And, even if it proves to be the case that Como's was free of violations, that fact alone would not suffice to establish deliberate indifference on the City's part. Absent any showing that the City was sufficiently on notice that a lack of training of DCS sanitarians was resulting in a pattern of constitutional deprivations, no reasonable factfinder could return a verdict in Clark's favor on his substantive due process claim. Accordingly, defendants are entitled to judgment as a matter of law on Clark's substantive due process claim.

■■■ We further note that where a substantive due process claim is predicated on the deprivation of a property interest, the Seventh Circuit has held that "in addition to alleging that the decision was arbitrary and irrational, 'the plaintiff must also show either a separate constitutional violation or the inadequacy of state law remedies.'" *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1481 (7th Cir.1990) (quoting *Polenz v. Parrott,* 883 F.2d 551, 558 (7th Cir.1989)). We have already discussed Clark's failure to adduce any evidence or argument as to the inadequacy of state law remedies. Here, we note that Clark's substantive due process claim does not involve any separate constitutional violation. The crux of Clark's substantive due process claim is that the temporary suspension of Como's license was arbitrary or irrational by virtue of the fact that the DCS personnel were unauthorized or unqualified to effect such a shut-down under the Municipal Code.[18]

17. The Court is mindful of the fact that the need to train municipal officers with respect to certain matters "can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10. For example, in *City of Canton,* the Court observed that where a municipality equips its police officers with firearms the need to train them as to the constitutional limits on the use of deadly force is obvious. We expressly find that the administrative inspection of food establishments by municipal sanitarians does not fall within this limited "obviousness" exception to the more general rule.

18. To whatever extent plaintiffs suggest that their substantive due process claim implicates an equal protection violation, the Court finds that plaintiffs have entirely failed to raise a triable

issue (indeed they do not even attempt to raise a triable issue) as to whether anyone from DCS acted to further the Khamises' discriminatory animus. It is undisputed that none of the people who conducted the inspections of Como's had any awareness of who had initiated complaints against Como's or the nature of the complaints. Similarly, there is not a shred of evidence linking the Khamises' discriminatory animus to either defendant Shoenberger or Shoenberger's deputy commissioner Pat Jackowiak. There is, in short, absolutely no evidence indicating that these individuals were even aware of the Khamis sisters' racist remarks, let alone that they acted for the purpose of effectuating the racial animus. We shall develop these findings in the following section, in which we discuss plaintiffs' equal protection claims; for now, however, we simply note that plaintiffs' unsupported intimations regarding "highly suspect" motivations driving DCS'

This contention is insufficient to support a substantive due process claim, however, because it involves only a matter of local or state law. The Seventh Circuit's remarks in *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461 (7th Cir.1988), are entirely appropriate here and so we quote them in full:

> This case presents a garden-variety zoning dispute dressed up in the trappings of constitutional law—a sure sign of masquerade being that the plaintiffs do not challenge the constitutionality of the zoning ordinances of the Village of Hoffman Estates but argue rather tha[t] the Board of Trustees had no authority under those ordinances to reject their site plan once the Village Plan Commission had approved it. If the plaintiffs can get us to review the merits of the Board of Trustees' decision under state law, we cannot imagine what zoning dispute could not be shoehorned into federal court in this way.... Something more is necessary than dissatisfaction with the rejection of a site plan to turn a zoning case into a federal case; and it should go without saying that the something more cannot be merely a violation of state (or local) law. A violation of state law is not a denial of due process of law.

*Id.* at 467. Although perhaps not "a garden-variety" health/sanitation code case, this case—at least as far as plaintiffs' substantive due process claim is concerned—presents only a question of state or municipal law. As the remarks in *Coniston* make clear, it is well-established that such questions do not give rise to a constitutional claim. *See also White v. Olig*, 56 F.3d 817, 820 (7th Cir.1995) (reiterating "that mere allegations of state law infraction are insufficient to support a section 1983 claim" and remarking "we fail to see how the mandates of Wisconsin state law alter the constitutional validity of [a civil bodily attachment] order").

For all of the foregoing reasons, defendants are entitled to judgment as a matter of law as to plaintiffs' substantive due process claim.

temporary closure of Como's cannot support

### (b.) *EQUAL PROTECTION*

The essence of plaintiffs' equal protection claim is that defendants Schulter and Shoenberger caused the inspection and temporary shut-down of Como's in order to effectuate or further the Khamis sisters' discriminatory animus against Como's Hispanic employees and patrons. Plaintiffs' argument essentially amounts to the following: The Khamises were racist and defendant Schulter was aware of it; Schulter responded to the Khamises' complaints about Como's by causing Shoenberger to make Como's the subject of a DCS task force inspection; DCS typically does not conduct inspections of restaurants such as Como's; therefore, Schulter and Shoenberger must have been acting with the improper and unlawful purpose of furthering the Khamises' discriminatory agenda. For the reasons that follow, we conclude that based on the evidence adduced by plaintiffs, no reasonable factfinder could return a verdict in favor of the plaintiffs on an equal protection claim and that the defendants are entitled to judgment as a matter of law. Before examining the evidence in this case, however, we first address some preliminary matters concerning (i) municipal liability, (ii) defendants Schulter and Shoenberger's entitlement (or, more properly, lack of entitlement) to qualified immunity or absolute legislative immunity, and (iii) the principles and standards that will guide the Court's equal protection analysis.

#### (i) *Municipal Liability*

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that there is no *respondeat superior* liability under § 1983. *See also McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 509 (7th Cir.1993) (noting "[i]t is now well settled that liability under section 1983 may not be imposed against a municipal entity under a theory of respondeat superior"); *Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir.1992) ("Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents."). As the Supreme Court noted in *Pembaur v. City of Cincinnati*, 475 U.S.

their substantive due process claim.

469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986), recovery from a municipal entity is thus "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." Because there is absolutely no evidence in this case from which a factfinder could conclude that the conduct of Schulter or Shoenberger in allegedly furthering the Khamises' discriminatory animus was taken pursuant to an official City policy or custom, the City is entitled to judgment as matter of law as to plaintiffs' equal protection claim.

### (ii) *Qualified Immunity & Absolute Legislative Immunity*

 It is equally clear that defendants Schulter and Shoenberger are not entitled to qualified immunity or absolute legislative immunity with respect to the allegations that they acted to further the Khamises' discriminatory animus when they caused Como's to be the subject of a DCFS task force investigation. This Court extensively reviewed the issue of absolute legislative immunity in *Chicago Miracle Temple Church, Inc. v. Fox,* 901 F.Supp. 1333, 1341–44 (N.D.Ill.1995), where we concluded that certain village trustees, who had allegedly taken some racially motivated official acts (*viz.,* authorizing the purchase of certain property to prevent a Black church group from purchasing it), were not entitled to absolute legislative immunity. As we noted in *Chicago Miracle Temple,* the determinative inquiry in deciding whether legislative immunity applies is whether the defendants' actions were taken in their "legislative capacity" or were merely "administrative or executive" actions. 901 F.Supp. at 1341. "Administrative or executive acts of legislators are not protected." *Rateree v. Rockett,* 852 F.2d 946, 950 (7th Cir.1988). It is the burden of the officials invoking legislative immunity to establish their entitlement to it. *Buckley v. Fitzsimmons,* 509 U.S. 259, 268–69, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993); *Walrath v. United States,* 35 F.3d 277, 281 (7th Cir. 1994); *Rateree,* 852 F.2d at 950.

As we explained in *Chicago Miracle Temple:*

*Yakus [v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ] and *Prentis [v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908) ] teach that at its core the legislative function involves determining, formulating, and making policy.

. . . . .

In accord with this proposition, several circuits have adopted approaches to analyzing claims of legislative immunity that, in one way or another, look to whether the defendant official was enacting or promulgating a policy or rule as opposed to simply enforcing, monitoring, or applying the policy.

... Our review leads us to conclude that an examination of whether the challenged act fundamentally involves policy-making as opposed to simply reflecting an ad hoc response to an issue confronting the governmental body is indeed a sound standard to determine whether legislative immunity is available.

901 F.Supp. at 1342–43. In the instant case, defendants have made no showing that in causing Como's to be the subject of a DCS task force inspection, they were doing anything other than responding in an ad hoc fashion to complaints raised by the Khamises and others. Conversely, there is no showing in the record that Schulter and Shoenberger's actions affected anyone or anything other Como's or that their actions involved any element of prospective, legislative-type policy-making. Accordingly, we conclude that these defendants were acting only in an administrative or executive capacity and are not entitled to absolute legislative immunity. *See Chicago Miracle Temple,* 901 F.Supp. at 1342–44 (citing cases). To the extent that plaintiffs' motion for partial summary judgment seeks a determination that Schulter is not entitled to absolute legislative immunity, the motion is granted.

 Nor are Schulter and Shoenberger entitled to qualified immunity. "Government officials sued in their individual capacities are entitled to qualified immunity 'insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.'" *Chicago Miracle Temple,* 901 F.Supp. at 1344 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). These defendants plainly should have known that action by municipal officials taken for the purpose of furthering either their own racial animus or that of Chicago's residents would violate plaintiffs' equal protection rights. *See United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1222–26 (2d Cir.1987) (citing cases); *Hodges v. Public Bldg. Comm'n,* 864 F.Supp. 1493, 1503 (N.D.Ill.1994) (citing cases). Accordingly, Schulter and Shoenberger are not entitled to qualified immunity.

### (iii) *Equal Protection Standards*

 It is axiomatic that federal, state, or municipal officials may not pursue a course of action based wholly or in part on a desire to discriminate against a racial group. *See, e.g., Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Nor may they pursue action in order to further or encourage the discriminatory animus of their constituents. *See, e.g., United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1222–26 (2d Cir.1987) (citing cases); *Hodges v. Public Bldg. Comm'n,* 864 F.Supp. 1493, 1503 (N.D.Ill.1994) (citing cases). As the Court observed in *Yonkers Bd. of Educ.,* "[A] governmental body may not escape liability under the Equal Protection Clause merely because its discriminatory action was undertaken in response to the desires of a majority of its citizens." 837 F.2d at 1224. Similarly, in *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984), the Supreme Court remarked:

> The Constitution cannot control [privately held] prejudices, but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect. "Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects

of private racial prejudice they assume to be both widely and deeply held."

*Id.* at 433, 104 S.Ct. at 1882 (quoting *Palmer v. Thompson,* 403 U.S. 217, 260–61, 91 S.Ct. 1940, 1962, 29 L.Ed.2d 438 (1971) (White, J., dissenting)).

 Nevertheless, it must be noted that a very delicate constitutional tension may arise when a when a known bigot seeks assistance from his or her elected official with respect to an otherwise legitimate complaint directed against the object of his or her bigotry. Plainly, nothing in the Constitution prohibits an elected official from being responsive to the otherwise legitimate complaints of even his or her most bigoted constituents. For better or for worse, even this Nation's racists are entitled to political representation and the assistance of their elected officials with respect to their otherwise legitimate concerns. Indeed, serious First Amendment concerns would exist if lawmakers were free to disregard the complaints of those constituents who advance unpopular or unpalatable views such as racial bigotry.

 Where, as here, the object of the constituent's complaint involves legitimate matters of concern (*e.g.,* health and sanitation) but the complaint is directed against one who is a member of the disliked racial group, difficult evidentiary issues will arise. We believe it to be clear, however, that a bigot is not precluded from seeking and obtaining official assistance solely by virtue of the fact that his or her complaint is directed against one who is a member of the disliked group. The critical inquiry in such cases must be whether the elected official is appropriately responding to a legitimate concern or is unlawfully catering to and effectuating the constituent's bigotry. We reach this conclusion in light of the well-established principle that a showing of discriminatory intent is a prerequisite to establishing a violation of the Equal Protection Clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293 ("purposeful discrimina-

tion is 'the condition that offends the Constitution'", quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). Where an elected official responds to a bigot's otherwise legitimate complaint (for example, a complaint against a minority-owned business), in order to rectify a genuine violation and without any intention or purpose of furthering the complainant's bigotry, there exists no discriminatory intent on the part of the official. This is true notwithstanding the fact that the official might know that the complainant is a bigot and that taking official action will have an adverse effect on the minority-owned business, for as *Feeney* teaches:

> "Discriminatory purpose," ... implies more than intent as volition or intent as awareness of consequences.... It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

442 U.S. at 279, 99 S.Ct. at 2296. The critical issue, then, is one of intent or purpose.[19]

■ In *Arlington Heights*, the Supreme Court noted that "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry" into the available circumstantial and direct evidence of intent. 429 U.S. at 266, 97 S.Ct. at 564. Included among the sort of evidence that a court might look to for evidence of discriminatory motive are: (1) whether the challenged conduct has a disparate impact; (2) whether there is a clear pattern of discriminatory conduct (of course, even a single discriminatory governmental act may be the basis of an equal protection violation, *see id.* at 266 n. 14, 97 S.Ct. at 564 n. 14); (3) the historical background or sequence of events leading to the governmental action; and (4) departures from normal procedural rules or typical substantive considerations.

Finally, we pause to acknowledge the difficulties of proof faced by a plaintiff alleging that he or she has been the subject of discriminatory official conduct. In this regard, the remarks of the Fourth Circuit in *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982), are particularly worth bearing in mind:

> Municipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that those statements can be captured for purposes of proving racial discrimination in a case such as this.

*Id.* at 1064. With all of the foregoing standards and remarks in mind, we now turn to consider the evidence presented to the Court.

### (a.) *The Khamises' Racial Animosity and Complaints Against Como's*

A significant portion of plaintiffs' evidentiary showing is designed to establish that the Khamis sisters harbor racial animus toward Hispanics. And, indeed, although

---

**19.** Other courts that have grappled with the issue of proving unlawful intent in cases involving elected officials who are charged with improperly effectuating the racial animus of their constituents have held that a sufficient showing of unlawful intent is made by establishing that "[1] the decision-making body acted for the sole purpose of effectuating the desires of private citizens, [2] that racial considerations were a motivating factor behind those desires, and [3] that members of the decision-making body were aware of the motivations of the private citizen[s]." *United States v. City of Birmingham*, 538 F.Supp. 819, 828 (E.D.Mich.1982), *aff'd as modified*, 727 F.2d 560 (6th Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *see also People Helpers, Inc. v. City of Richmond*, 789 F.Supp. 725, 732 (E.D.Va.1992) (quoting *City of Birmingham* with approval). In view of this Court's discussion above, we believe that the first of these three showings must be restated as follows, "the decision-making body acted in whole or part with the purpose of effectuating the discriminatory desires of private citizens." Absent this revision, the *City of Birmingham* formulation leaves open the possibility that an Equal Protection violation will be found where an elected official has acted only "in spite of" his or her constituent's racial animus *not* "because of" that animus.

much of plaintiffs' showing is inadmissible hearsay, which may not be considered by the Court when ruling on a motion for summary judgment, *see Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995); *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir.1994), they nevertheless have adduced sufficient evidence to raise a triable issue as to this point. The deposition testimony of Amalia Gloria, Maria Tranculov, Gary Kass, and Raul Contreras all support a reasonable inference as to the Khamises' racial bigotry. Although the Khamises disavow ever making any statements of the type attributed to them, for purposes of the defendants' summary judgment motion the Court must take the plaintiffs' evidence as true and draw all reasonable inferences in favor of the plaintiffs. When this is done, there can be no doubt but that a reasonable factfinder could find that the Khamises hold stereotypical and racist views concerning Hispanics. Although we need not recount all of the relevant testimony, we note that Suzanne Khamis' alleged statement that Mexicans are dirty, Victoria Khamis' alleged statements to the effect that she is sick of seeing the 4606 N. Hermitage residents wearing their funny hats and boots and eating tamales or tortillas, and the statement attributed to one of the Khamis sisters that all Hispanics look alike to her, are all very unfortunate and disturbing indicators of racial animus. Accordingly, for purposes of deciding this motion, the Court shall assume that the Khamises harbor racist sentiments toward Hispanics. However, as the Court endeavored to explain above, establishing that the Khamises may be bigots takes the plaintiffs only a small portion of the way toward proving that the defendants acted unlawfully by responding to the Khamises' complaints against Como's.

The next step in the inquiry requires an examination of whether the Khamises' racial animosity motivated their complaints against Como's. The evidence on this score is somewhat equivocal. The record indicates that Como's was not, by any means, the lone object of the Khamises' complaints. To the contrary, the record reflects that the Khamises have lodged complaints about the pizza establishment that occupied Como's location prior to Como's, the neighborhood YMCA, the American Indian Center, the In and Out Grocery (a neighborhood grocery store), and an apartment complex located at 4606 N. Hermitage. There is no evidence in the record to suggest that the Khamises' complaints about the disrepair of the YMCA or the building code violations at the American Indian Center and the grocery store had any racial component to them. And, although the record reveals that some of the Khamises' complaints about the 4606 N. Hermitage building embodied some of the same types of racist sentiments as their complaints about Como's, not all of the complaints did. For instance, the building owner testified that shortly after he acquired the building, Victoria Khamis raised some complaints she had concerning the building, including the fact that building janitor's daughter, who was caucasian, used to lay out in the sun in front of the building.

Significantly, the record also reflects that even before Como's opened for business—and, therefore, before Como's could have attracted any customers, Hispanic or otherwise—Victoria Khamis introduced herself to Clark (who is caucasian), admonished him as to how he should run his business, and threatened that she could get his business shut down.

 Thus, when the record is viewed in its totality, it is evident that the Khamises' complaints about conditions in the neighborhood cannot be characterized as deriving solely from their alleged bigotry. Moreover, the record reflects that many of the Khamises' complaints about various violations had some validity. For example, the YMCA *was* torn down and Como's *was* found to be in violation of several ordinances. Of course, the fact that the Khamises may have voiced complaints that were not racially driven does not diminish the evidence that *as to Como's*, their complaints may have had their origins in stereotypic and discriminatory beliefs about Mexicans. At the very least, on the present record it would not be unreasonable for a factfinder to conclude that the Khamises' complaints were racially driven. However, as we discuss in the next section, the fact that the Khamises had legitimately complained about any number of properties is

also quite relevant to the question of whether defendants Schulter and Shoenberger acted with the intent of furthering the Khamises' alleged bigotry.

(b.) *Schulter and Shoenberger's Alleged Furtherance of the Khamises' Racial Animosity*

The Khamises had successfully sought the assistance of Alderman Schulter, as well as other City officials, on a number of occasions. There is no dispute that Schulter was responsive to the Khamises' complaints regarding the properties referred to in the preceding paragraph. *See* Schulter Dep. at 38–45. Nor is there any evidence in the record that the complaints about those properties were invalid in any way. When asked about whether he had ever taken any action with respect to complaints that Victoria Khamis had made and, if so, what sort of action, Schulter stated: "Like other problem buildings in the area, if it was brought to our attention that there were certain codes that were being violated, that would affect the safety and welfare of people, of course, we would bring that to the attention of the proper authorities in the city." Schulter Dep. at 41. Schulter further testified as follows:

Q. How would you characterize your relationship, as alderman, with UPRAVE?

A. I think that to characterize it best would be that we have a working relationship most of the time.

. . . . .

Q. It's true, isn't it, that as a policy, you do try to accommodate the complaints or concerns of a group like UPRAVE?

A. (over objection) I guess we try to help out all the civic organizations in the ward.

*Id.* at 56, 61.

■ It is hardly surprising that Schulter would be responsive to the Khamises' complaints. As the plaintiffs themselves have impressed upon the court, Victoria Khamis is the mouthpiece for UPRAVE, *see* Pls.' Add'l Facts ¶ 13, and:

UPRAVE has a telephone list of some 1500 members in the community . . . it has 50–100 "active members" at any given time and has met the day before elections; and it may raise $100,000 per year.

*Id.* ¶ 14. Plaintiffs' evidence plainly indicates that UPRAVE is an active community group with a sizeable constituency. There is nothing unusual or facially pernicious about the fact that an elected official would strive to be responsive to the legitimate concerns of such a group. And, quite apart from the fact that there is no probative evidence in the record to suggest that Schulter treated complaints from the Khamises or UPRAVE any differently than complaints by any other constituent or community group, even if he did act to curry the favor of the Khamises for "political" reasons, there is nothing constitutionally improper about that so long as improper considerations do not enter the official's calculus. As the Seventh Circuit recently observed " 'politics' is hardly a forbidden ground of decision by a political body." *Marusic Liquors, Inc. v. Daley,* 55 F.3d 258, 263 (7th Cir.1995). It is also significant to note that Schulter was apparently not the only City official that has been responsive to the Khamises' (or UPRAVE's) complaints. The record reflects that in 1991, the City's Zoning Administrator Graham Grady and Terry Teele from the Mayor's Office of Inquiry and Information met with Victoria Khamis and discussed Como's as well as the 4606 N. Hermitage building. As a result of the meeting, Grady requested the Department of Buildings to inspect the apartment complex for possible building code violations and Grady submitted a complaint to the Department of Health concerning Como's.

■ Notwithstanding Schulter's history of responding to the Khamises' other legitimate complaints and the fact that other City officials have also been responsive to the Khamises' complaints in the past, plaintiffs urge upon the Court that improper racial considerations did in fact enter into Schulter's decision to cause Como's to be investigated. Plaintiffs' principal evidentiary basis for this contention is evidence to the effect that sometime around late 1990 or 1991, Suzanne Khamis made racially offensive remarks in the context of complaining about Como's at a meeting during which Schulter was present. Also, plaintiffs offer evidence

**1402**

that Victoria Khamis made racially offensive remarks concerning Mexicans at an UPRAVE meeting at which Schulter and/or his aides *may* have been present.[20] These two incidents—one dating back to late 1990 or 1991 and the other involving a meeting at which it is doubtful that Schulter was even present—is essentially all that plaintiffs have to offer to connect Schulter to the Khamises' discriminatory animus.

Perhaps recognizing the need to establish that Schulter acted because of the Khamises' racial hostility rather than merely in spite of his possible awareness of that hostility, plaintiffs suggest that a genuine issue of material fact as to Schulter's intent is created by evidence to the effect that some of the complaints raised by the Khamises and followed-up upon by Schulter were stereotypical in nature. In particular, plaintiffs look to the following testimony by Gary Kass, owner of the 4606 N. Hermitage apartment building:

Q. Based upon the context of the experiences you have had with the alderman's office and the Khamises concerning their complaints about your building, the tenants, other conversations they have had about tenants in other buildings, the Como's Pizza situation, do you feel that they have at all been stereotypical in singling out these places?

A. MS. ROBINSON (defendants' counsel): Who is they you are referring to?

Q. I said anyone from the alderman's office and the Khamises.

A. That they are what?

Q. That they are stereotypically for any reason singling out their complaints on these issues?

A. (over objection) I would say to a degree yes.

. . . . .

Q. —based on your experience do you feel there is a prejudicial aspect here?

A. I don't know if you can tie the two together, but I think they brought up issues and problems with the building.

I'm not naive, I know what people's perception of certain types of people are and some of the concerns and things they brought up to me are definitely associated or things I have heard that you would relate to certain types of races of people.

Kass Dep. at 97–98. However, even when this testimony is read most generously in plaintiffs' favor it does not indicate that Schulter was acting because of the Khamises' racial hostility. This testimony says little more than that some of the Khamises' complaints may be rooted in racial stereotyping, which takes us no further than the already accepted proposition that the Khamises hold certain racist views. The testimony reveals absolutely nothing about Schulter's motivations in investigating the complaints.[21] Nor is there any evidence to suggest that the Khamises' complaints were so objectively unreasonable that Schulter should have been put on notice that the complaints could only have been driven by racial animus.

The uncontroverted record in this case reveals that when complaints are brought to Schulter's office (by the Khamises or any other resident of the ward) they are either referred out to an appropriate City department or investigated further. That is all that has happened here. There is simply no evidence that Schulter would have responded in any different manner had the same complaints been brought by any other resident. After a careful review of the plaintiffs' evidence in its most favorable light, the Court concludes that no reasonable factfinder could find that Schulter's conduct was motivated by an intent to further or effectuate the Khamises' racial hostility.

**20.** Gary Kass explicitly testified that he was "fairly certain that Alderman Schulter wasn't there." Kass Dep. at 147.

**21.** The Court also notes that under plaintiffs' reasoning, Schulter's hands would be effectively tied with respect to responding to health and sanitation concerns raised by the Khamises because of the nexus between such concerns and a stereotypical belief. Under plaintiffs' reasoning, Schulter would be placed in a position of saying "Although health and sanitation concerns are legitimate objects of official action, I can't respond to your complaints, go find a nonracist resident to bring the complaint." This is plainly a nonsensical result.

■ While the evidence that Schulter acted with the intent of furthering the Khamises' racial animus is fundamentally deficient, the evidence as to Shoenberger is completely nonexistent. The undisputed evidence is that Shoenberger was first introduced to the Khamises at the May 13, 1994 meeting and had never heard of Como's prior to the meeting. Further, it is uncontroverted that at no time during the meeting was there any mention of the race or ethnicity of any of Como's employees or customers. Defs.' Facts ¶ 20. Simply put, there is not a shred of evidence that Shoenberger or anyone on her staff were aware that the Khamises may have harbored racial animus. Accordingly, no reasonable factfinder could find that any of Shoenberger's conduct was motivated by an intent to further or effectuate the Khamises' racial hostility.

Although plaintiffs devote a substantial amount of energy to showing that DCS' involvement in the Como's inspection was irregular and therefore suspect, consideration of the record as a whole leads to the conclusion that this fact is of minimal significance. In the first place, there is no evidence that at the May 13 meeting, or at any other time, Schulter communicated a desire to Shoenberger that Como's be shut down or in any other way hindered. As far as the record reveals, Shoenberger simply understood Schulter to be requesting that Como's be investigated, nothing more. Nothing in the record suggests that such a request is tantamount to a request that a closure be instituted. It is also worth noting that there is no evidence that Schulter had any special relationship with Shoenberger, or that Shoenberger was unusually or suspiciously responsive to Schulter's requests, or that Schulter calls upon Shoenberger's office (as opposed to any other City department) when he wants "results." And, there is no evidence that DCS had a high, let alone suspiciously high, rate of finding ordinance violations or closing food establishments that it had inspected.

Moreover, it must not be forgotten that there is no evidence in the record that Schulter directed Shoenberger that DCS personnel should conduct the actual inspection of Como's. Schulter requested that Como's be the subject of a task-force investigation; there is no evidence that he instructed Shoenberger as to what City departments should participate in the investigation. The record reflects that the decision that DCS sanitarians could conduct the inspection originated with Pat Jackowiak, Shoenberger's Deputy Commissioner. There is not an iota of evidence suggesting that Jackowiak harbored any racial animus or that her determination that DCS sanitarians could conduct the inspection of Como's was motivated by a desire to further anyone else's discriminatory motives. Indeed, the it is uncontroverted that Jackowiak was not specifically informed of the identity of the residents who had made the complaints about Como's and she had never even heard of Como's prior to the May 1994 meeting. Thus, while the plaintiffs may be correct in their position that the DCS inspection of Como's may have been unusual (in the sense that more typically the Health Department would conduct such an inspection), no factfinder could reasonably infer that the decision to have DCS sanitarians conduct the inspection had its origins in racial discrimination.

To take more wind out of plaintiffs' already deflated sail, it must also be borne in mind that, with the sole exception of Shoenberger, who was aware that the complaints about Como's had originated with the Khamises, all of the DCS personnel involved in the inspection and temporary shut-down of Como's were blind as to the origin and nature of the complaints. In view of this fact, it would be entirely unreasonable to conclude that the inspectors were motivated by a desire to further the Khamises' discriminatory animus, or were attempting to please Alderman Schulter, in reaching their determinations that ordinance violations existed. Moreover, Clark admits that many of the cited violations existed—thus, it can hardly be suggested that they were manufactured in order to justify an improper shut-down.

■ In the final analysis, plaintiffs' evidence in this case does not add up to anything more than that the Khamises harbor discriminatory animus and that that animus may have motivated some of their complaints about Como's. Even assuming *arguendo*

that Alderman Schulter knew of this motivation, there simply is no evidence that raises anything more than a metaphysical possibility that he responded to the Khamises' complaints *because of* their racial animosity rather than merely *in spite of* it. The sorts of complaints raised by the Khamises addressed entirely proper matters for official investigation (*e.g.*, concerns about criminal activity, health and sanitation) and there is simply not sufficient probative evidence to raise a triable issue as to whether Schulter responded to these complaints for any improper purpose. Plaintiffs' emphasis on the fact that DCS sanitarians conducted the inspection of Como's does not implicate Schulter because he had nothing to do with that decision. Finally, plaintiffs' implicit position that the closure of Como's was proximately caused by Schulter's improper motive is utterly belied by the uncontroverted fact that all of the decisions relating to the inspection and closure of Como's were made by persons with no knowledge that Schulter may have wanted the business shut down. On this record, no reasonable fact finder could return a verdict in favor of the plaintiffs on their equal protection claim and defendants are entitled to judgment as a matter of law.

*Plaintiffs' Claim for Declaratory Judgment and Injunctive Relief*

All that remains in this case is plaintiffs' request for a declaration of "[p]laintiff's rights and responsibilities under the Municipal Code and Illinois statutes as pertinent to this dispute, and a declaration of defendants' powers and obligations thereunder." Sec.Am.Compl. at 13. Plaintiffs also seek an injunction enjoining defendants "from further wrongful exercise of their regulatory and licensing authority." *Id.* As is clear from the language of the complaint, these requests for declaratory and injunctive relief only raise questions of state and municipal law. This Court's jurisdiction over such claims is supplemental. Under the authority of *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court declines to exercise its supplemental jurisdiction over this remaining state-law claim. *See id.* at 726–27, 86 S.Ct. at 1139–40 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *see also Estate of Warner v. U.S.,* 754 F.Supp. 1271, 1279–80 (N.D.Ill.1990) (following *Gibbs* and dismissing supplemental claims after granting summary judgment on a § 1983 claim arising out of an automobile accident following a high speed chase). The Court finds that exercising its discretion to decline supplemental jurisdiction is particularly appropriate here in view of the fact that there are presently pending state court ordinance violation proceedings arising out of the DCS inspection of Como's and we see no reason why plaintiffs cannot raise their objections to DCS' allegedly unlawful exercise of authority there. Moreover, we believe that considerations of comity militate strongly in favor of allowing a state tribunal to have the first opportunity to consider the proper interpretation of the City's Municipal Code. Accordingly, plaintiffs' claim for declaratory relief is dismissed without prejudice, for want of jurisdiction.

*CONCLUSION*

There is no question that the plaintiffs have serious disputes with the defendants' municipal enforcement actions in this case. However, for the above stated reasons, this Court finds that these disputes should not be resolved in a federal forum because the record would not allow a reasonable factfinder to conclude that any of the defendants' actions violated the plaintiffs' federal constitutional rights. Therefore, the Court must grant summary judgment in favor of the defendants. The Clerk of the Court is directed to enter judgment in favor of the defendants on all of plaintiffs' federal claims. This case is hereby dismissed with prejudice, both sides to bear their own costs.